797 F.2d 1164
 55 USLW 2073
 CAPITAL CITIES MEDIA, INC., t/d/b/a the Wilkes-Barre Times
Leader and Scheier, Robert, Assistant City Editor, Appellants
v.
CHESTER, James W., Regional Director, Northeast Region,
Pennsylvania Department of Environmental Resources, and
Carmon, Mark R., Community Relations Coordinator, Northeast
Region, Pennsylvania Department of Environmental Resources,
and Debenedictis, Nicholas, Secretary, Pennsylvania
Department of Environmental Resources, and Pennsylvania
Department of Environmental Resources.
 No. 85-5132.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 23, 1985.
Argued In Banc May 5, 1986.
Decided July 21, 1986.
 
 Ralph E. Kates, III (argued), Griffith, Aponick & Musto, Wilkes-Barre, Pa., for appellants.
 LeRoy S. Zimmerman, Atty. Gen., Gregory R. Neuhauser, Senior Deputy Atty. Gen. (argued), Andrew S. Gordon, Senior Deputy Atty. Gen., Allen C. Warshaw, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Attorney General, Litigation Section, Harrisburg, Pa., for appellees.
 Before GIBBONS, SLOVITER and STAPLETON, Circuit Judges.
 Before ALDISERT, Chief Judge, and SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON and MANSMANN, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 Capital Cities Media, Inc. and Robert Scheier, the publisher and Assistant City Editor of a Wilkes-Barre newspaper, the Times Leader, appeal from an order of the district court denying their motion for a preliminary injunction and dismissing their complaint, 609 F.Supp. 494. Defendants are the Pennsylvania Department of Environmental Resources and various of its officials. Appellants ("Times Leader") contend that appellees ("D.E.R." or "Department") denied them access to records in the sole possession of D.E.R., in violation of Times Leader's First Amendment and state law "right to know". Times Leader further contends that the Department's practices with respect to the production and withholding of its records deprives Times Leader of equal protection of the law.
 
 
 2
 The district court dismissed the complaint for failure to state a claim under the First Amendment and Equal Protection Clause, and held that, under Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Eleventh Amendment barred the court from considering the state law basis for Times Leader's claim of access to the records.
 
 
 3
 We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. Our review is plenary. We assume, as we must, that Times Leader will be able to prove the facts which it alleges in its amended complaint. Moreover, because the district court treated an affidavit filed by Times Leader as a supplement to its complaint, we do likewise and assume the truth of the allegations contained therein for purposes of this appeal.
 
 I. BACKGROUND
 
 4
 In December 1983, a major northeast Pennsylvania supplier of drinking water, Pennsylvania Gas & Water Company, placed 250,000 customers on water use restrictions after an outbreak of giardiasis, an intestinal illness caused by the contamination of drinking water by giardia cysts. Over four hundred consumers contracted the illness. D.E.R. is responsible for enforcing various environmental laws and regulations designed to protect the integrity of the public water supplies.
 
 
 5
 Times Leader investigated the causes of the giardiasis outbreak, including D.E.R.'s possible culpability, and published some four hundred articles and opinion pieces dealing with this incident, approximately one fifth of which have focused on the D.E.R. and the individual defendants in this case. Some of these articles and opinion pieces raised questions of whether political influence or other improper considerations led D.E.R. selectively to enforce its environmental mandate. The articles also examined the enforcement strategy of D.E.R. and its predecessor agencies with regard to sewage discharge problems of Roaring Brook Township and Spring Brook Township, the two townships identified by D.E.R. as the most likely sources of the giardia cyst contamination.
 
 
 6
 Pursuant to its investigation, Times Leader submitted a written request to D.E.R. for access to documents, including:
 
 
 7
 Records identifying the 80 to 85 known sewage violators in Spring Brook Twp.
 
 
 8
 Records, including dates of surveys made to identify the sewage violators.
 
 
 9
 Correspondence between DER and Spring Brook Twp. officials during the past 10 years.
 
 
 10
 Roaring Brook Estates--permits issued and correspondence concerning the sewage problems there.
 
 
 11
 Elmbrook Development--permits issued and correspondence concerning the sewage problems there.
 
 
 12
 Correspondence between DER and Roaring Brook Twp. officials during the past 10 years.
 
 
 13
 Appendix at 31 (A31).
 
 
 14
 On April 18, 1984, and for several days thereafter, Times Leader inspected a substantial amount of materials provided by D.E.R. at the Department's Wilkes-Barre office. During that inspection, D.E.R. officials informed Times Leader that certain documents had been withheld from the inspection, apparently because
 
 
 15
 Department policy statewide allows for review of all files at Regional Offices and in Harrisburg with the following exceptions:
 
 
 16
 1. Interoffice memorandum.
 
 
 17
 2. Documents relating to attorney/client relationships.
 
 
 18
 3. Citizen complaints.
 
 A33.
 
 19
 According to Times Leader, the materials it inspected included a substantial number of documents which fell into these excepted categories. Moreover, D.E.R. has been unable to provide Times Leader with a copy of this policy. Indeed, an Assistant Counsel for D.E.R. informed Times Leader that there was in fact no formal statewide policy on public access to information, and that each regional D.E.R. office generally could set its own standard.
 
 
 20
 At the request of Times Leader, D.E.R. verbally provided a more complete description of the withheld documents. The documents included citizen complaints (six to twelve documents), attorney-client communications (three to four documents), memoranda generated by technical personnel that discuss enforcement strategy and options (approximately six documents); and memoranda generated by technical personnel discussing the results of D.E.R.'s investigation of the giardiasis or sewer problems (undisclosed number of documents). The bulk of the documents fall into the last category.
 
 
 21
 The Department also provided Times Leader with a copy of its "Public Information General Policy and Guidelines." That document states that "All citizens shall be provided access to Departmental records and documents," with the following exceptions:
 
 
 22
 1. Any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its duties;
 
 
 23
 2. Any item which is prohibited, restricted or forbidden by statute or order of court, or which would operate to the prejudice or impairment of the person's reputation or personal security;
 
 
 24
 3. Any item which would result in the loss by the Commonwealth or any political subdivision thereof, of federal funds.
 
 A34.[1]
 II. THE FIRST AMENDMENT
 
 25
 The issue posed by Times Leader is whether the First and Fourteenth Amendments to the United States Constitution require officials of a state agency either to furnish information relating to an agency investigation to members of the public who request such information or to justify their refusal to do so by demonstrating a compelling state interest which cannot be vindicated in a less restrictive manner. Times Leader urges that the First and Fourteenth Amendments impose such an obligation on all public officials in order that the people may know about, evaluate and influence the activities of their government.
 
 
 26
 There is, of course, no doubt about the value to the Republic of an informed electorate. Nor can there be doubt that a core purpose of the free speech and press clause is to promote the circulation of information and ideas necessary to make government by the people a workable reality. At the same time, neither Times Leader nor any other commentator has suggested that it is necessary, desirable, or even possible to provide the citizenry with access to all of the information in the possession of their governments. As a result, the underlying issue which must be faced here is not whether it is desirable to have an informed electorate, but rather, who is to decide which government-held information must be made available to the public and by what criteria such decisions will be made. If a right of access were implicit in the First Amendment, as Times Leader urges, this task would be assigned to the judiciary and the courts would be required to fashion a constitutional freedom of information act.
 
 
 27
 The First Amendment, however, seeks to promote the ideal of an informed electorate by barring government interference with the flow of information and ideas to the public. The founding fathers intended affirmative rights of access to government-held information, other than those expressly conferred by the Constitution, to depend upon political decisions made by the people and their elected representatives. This conclusion finds support in the text of the First Amendment, the historical gloss on that text, and the First Amendment caselaw.
 
 A.
 
 28
 The First Amendment provides that "Congress ... shall make no law ... abridging the freedom of speech, or of the press." The Fourteenth Amendment extends this preclusion to actions by the states. This means that, with a few, carefully crafted exceptions, the government can neither interfere with anyone who is attempting to speak or publish nor punish him or her thereafter for having done so.[2] It further means that government cannot interfere with one reading or hearing that which someone else wishes to communicate.[3] The free speech clause also precludes government interference with the flow of information at a pre-publication stage. Thus, the government may not interfere with those seeking information to communicate to others. "There is an undoubted right to gather news 'from any source by means within the law.' " Houchins v. KQED, Inc., 438 U.S. 1, 11, 98 S.Ct. 2588, 2594, 57 L.Ed.2d 553 (1978) (quoting Branzburg v. Hayes, 408 U.S. 665, 681-82, 92 S.Ct. 2646, 2656-57, 33 L.Ed.2d 626 (1972)). Moreover, we now know that the free speech clause bars government interference with the flow of information through the closure of governmental proceedings that historically have been open to the public, except in certain limited circumstances.[4] Government interference in each of these guises can fairly be characterized, in the words of the First Amendment, as "abridging the freedom of speech."
 
 
 29
 By contrast, it requires some straining of the text to construe the Amendment's explicit preclusion of government interference as conferring upon each citizen a presumptive right of access to any government-held information which may interest him or her. While one disposed to stretch the language to reach this case may do so, it nevertheless requires a level of abstraction that we are unwilling to ascribe to the framers of the First Amendment. It simply does not seem reasonable to suppose that the free speech clause would speak, as it does, solely to government interference if the drafters had thereby intended to create a right to know and a concomitant governmental duty to disclose.
 
 B.
 
 30
 Fortunately, we have more than the text of the free speech clause to guide us. The issue that we face today is not one that has arisen only recently in our evolution as a free society. Citizen access to government-held information was an issue raised and debated in the Constitutional Convention, in the state assemblies that deliberated on ratification, and in the First Congress of the United States. Those debates confirm that the founders of the Republic considered an informed public essential to our representative system of self-government.
 
 
 31
 The concern for an informed public led to the adoption of a number of constitutional provisions. In Article I, Section 9, it is provided that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." Article II, Section 3 further provides that the President "shall from time to time give to the Congress Information of the State of the Union ..." Article I, Section 5 specifically directs that each House of Congress shall "from time to time publish ... [a Journal of its Proceedings], excepting such Parts as may in their Judgment require Secrecy."[5] Finally, in addition to these specific requirements of governmental disclosure, the First Congress proposed, and the States ratified, the First Amendment's preclusion of governmental interference with speech and the press. Beyond these provisions, history indicates that the founders of the Republic left decisions concerning the release of government-held information to the democratic process.
 
 
 32
 Some participants in these debates felt that these constitutional provisions were inadequate. In the discussion leading to adoption of the Journal publication clause, for example, James Wilson, a member of the Pennsylvania delegation, contended that "the people have a right to know what their agents are doing or have done, and it should not be in the option of the legislature to conceal their proceedings."[6] His sentiments were echoed by other delegates to the Convention.[7] At the Virginia ratification convention, Patrick Henry decried the ambiguity of the publication clause:
 
 
 33
 Give us at least a plausible apology why Congress should keep their proceedings in secret. They have the power of keeping them secret as long as they please [in article I, section 2, clause 3], for the provision for a periodical publication is too inexplicit and ambiguous to avail any thing. The expression from time to time, as I have more than once observed, admits of any extension. They may carry on the most wicked and pernicious of schemes under the dark veil of secrecy. The liberties of a people never were, nor ever will be, secure, when the transactions of their rulers may be concealed from them. The most iniquitous plots may be carried on against their liberty and happiness.[8]
 
 
 34
 Nonetheless, even Henry conceded that not all transactions should be published, such as those related to "military operations or affairs of great consequence ... till the end which required their secrecy should have been effected."[9] As James Madison observed, "[t]here never was any legislative assembly without a discretionary power of concealing important transactions, the publication of which might be detrimental to the community."[10] Despite the reluctance of some, this view ultimately prevailed and resulted in the people's representatives being granted the right to withhold from the public "such Parts [of their Proceedings] as may in their Judgment require Secrecy."
 
 
 35
 Nor did the founding fathers, as they undertook the practical implementation of their new government, find that public, at will access to government information was a necessary prerequisite to an informed electorate. Seventeen members of the First Congress had been delegates to the Constitutional Convention. It was they and their fellow members of the First Congress who proposed the first ten amendments. As the Supreme Court recently observed, "the First Congress 'was a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument.' " Lynch v. Donnelly, 465 U.S. 668, 674, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984) (quoting Myers v. United States, 272 U.S. 52, 174-75, 47 S.Ct. 21, 44-45, 71 L.Ed. 160 (1926)).
 
 
 36
 The members of this First Congress did not open their own proceedings to the public. Following the tradition of the colonial assemblies and the Constitutional Convention itself, the Senate met behind closed doors until 1794 and the House followed a similar practice until the War of 1812.[11] While both Houses thereafter opened floor deliberations, committee sessions remained closed and were not routinely open to the public until the mid-1970's.[12] This Congressional tradition of controlling access to governmental information through politically accountable decision-making remains with us today. The Senate is currently operating under a 1980 resolution that, in the words of its sponsor, provides "for the first time in the Senate's 191-year history, a program for systematic public access to ... [the Senate's] nonsensitive records...."[13] This resolution authorizes the National Archives to give public access to "routine Senate records" 20 years from the date of their creation and to "sensitive records, such as investigative files" 50 years after their creation.[14] Each Senate committee retains the right to extend or shorten the access period for its own records.[15]
 
 
 37
 The executive branch from the early days of the Republic also followed practices fundamentally inconsistent with an understanding that members of the public had a constitutionally protected right of access to government information. Thomas Jefferson, a strong proponent of public access,[16] himself refused to turn over the Burr papers to Chief Justice Marshall, reserving the right to determine what information he must release:
 
 
 38
 With respect to papers, there is certainly a public and a private side to our offices. To the former belong grants of land, patents for inventions, certain commissions, proclamations, and other papers patent in their nature. To the other belong mere executive proceedings. All nations have found it necessary, that for the advantageous conduct of their affairs, some of these proceedings, at least, should remain known to their executive functionary only. He, of course, from the nature of the case, must be the sole judge of which of them the public interests will permit publication. Hence, under our Constitution, in requests of papers, from the legislative to the executive branch, an exception is carefully expressed, as to those which he may deem the public welfare may require not to be disclosed....[17]
 
 
 39
 Thus, Jefferson believed that the balance between the public's interest in knowing about the workings of government and the executive's need for secrecy should be struck by the executive. Jefferson's approach is consistent with that of Congress, leaving to the political process ultimate resolution of what and how much information will be deemed confidential.
 
 
 40
 Our national experience has shown that this reliance upon the political process has not been misplaced and that the people's representatives have not been unresponsive to political pressure when increased public access is needed. The last three decades have produced profound changes in the law of access to government information. The relative recency of these changes may be traced to the greater public need for such information that has accompanied the growth of government at all levels. On the federal level, political pressure for greater access has led to passage of three significant statutes governing release of government-held information: the Freedom of Information Act of 1967,[18] the Privacy Act of 1974,[19] and the Government in the Sunshine Act of 1976.[20] These developments have been matched--and indeed in some respects exceeded--on the state level. Over half of the states adopted access laws while Congress wrestled with the terms of the Freedom of Information Act.[21] Before 1950, only one state had passed legislation mandating a public right to attend public meetings. In contrast, today all 50 states have their own "government in the sunshine" laws.[22] These developments are a clear indication that legislators have been responsive to public demands for increased access to government-held information.[23]
 
 C.
 
 41
 Thus, decisions as to how much governmental information must be disclosed in order to make democracy work historically have been regarded as political decisions to be made by the people and their elected representatives. Conversely, the judiciary has never asserted the institutional competence to make such decisions. The reason seems apparent. Neither the free speech clause nor the structure of the government described by the Constitution yields any principled basis for deciding which government information must be made available to the citizenry and which need not.
 
 
 42
 The absence of a principled basis for defining the right to know was noted in Houchins v. KQED, Inc., 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), the Supreme Court case which offers the most helpful guidance in the current context. In Houchins, the press requested access to county jail facilities, contending that "access to penal institutions is necessary to prevent officials from concealing prison conditions from the voters and impairing the public's right to discuss and criticize the prison system and its administration." 438 U.S. at 8, 98 S.Ct. at 2593. While the right asserted was a press right of access, the underlying premise of the supporting argument was that press access is necessary to vindicate the public's right to informed self-government. The Chief Justice's characterization of the position of the respondents in Houchins is reminiscent of that of Times Leader here:
 
 
 43
 From the right to gather news and the right to receive information, they argue for an implied special right of access to government-controlled sources of information. This right, they contend, compels access as a constitutional matter. Respondents suggest further support for this implicit First Amendment right in the language of Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936), and Mills v. Alabama, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966), which notes the importance of an informed public as a safeguard against "misgovernment" and the crucial role of the media in providing information....
 
 
 44
 438 U.S. at 7-8, 98 S.Ct. at 2592-93.
 
 
 45
 A majority of the seven judge Court in Houchins held that there is no First Amendment right of press access to government-held information and, in the process, rejected the idea of a First Amendment right of public access. The Chief Justice's plurality opinion noted that the "Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control," 438 U.S. at 9, 98 S.Ct. at 2593, and that the "undoubted right to gather news ... affords no basis for the claim that the First Amendment compels others--private persons or governments--to supply information." 438 U.S. at 11, 98 S.Ct. at 2594. Turning from precedent to practicality, the Chief Justice continued:
 
 
 46
 The respondents' argument is flawed, not only because it lacks precedential support and is contrary to statements in this Court's opinions, but also because it invites the Court to involve itself in what is clearly a legislative task which the Constitution has left to the political processes....
 
 
 47
 * * *
 
 
 48
 * * *
 
 
 49
 There is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information. Because the Constitution affords no guidelines, absent statutory standards, hundreds of judges would, under the Court of Appeals' approach, be at large to fashion ad hoc standards, in individual cases, according to their own ideas of what seems "desirable" or "expedient." We, therefore, reject the Court of Appeals' conclusory assertion that the public and the media have a First Amendment right to government information regarding the conditions of jails and their inmates and presumably all other public facilities such as hospitals and mental institutions.
 
 
 50
 438 U.S. at 12, 14, 98 S.Ct. at 2595, 2596 (emphasis supplied).
 
 Justice Stewart was in agreement:
 
 51
 The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government, nor do they guarantee the press any basic right of access superior to that of the public generally. The Constitution does no more than assure the public and the press equal access once government has opened its doors. Accordingly, I agree substantially with what the opinion of THE CHIEF JUSTICE has to say on that score.
 
 
 52
 438 U.S. at 16, 98 S.Ct. at 2597 (Stewart, J., concurring in judgment) (emphasis supplied).
 
 
 53
 Contrary to the suggestion of Times Leader, invocation of "compelling state interest" analysis does not dispel the problem identified by the Chief Justice in Houchins. Recognition of an across-the-board First Amendment right to know would necessarily require the judiciary to "balance" the individual's right of access against competing state interests. Initially at least, the values assigned to the competing secrecy interests[24] necessarily would involve standardless decisionmaking.[25] As one commentator has pointed out, while the need for military secrecy in time of war may be obvious, how can a court meaningfully value "the less obvious, less dramatic consequences of disclosure of any one of millions of documents that are the stuff of governing and of international relations?"[26] Also required would be a multitude of ad hoc decisions about the timing of governmental disclosure.
 
 
 54
 Adoption of Times Leader's position would ultimately lead the courts to legislate categories of exclusions. Indeed, such an approach would seem to be required to prevent the newfound right to know from being set adrift in a sea of never-ending litigation. Congress fashioned its Freedom of Information Act list of exclusions over a ten-year period. It relied on the interaction of countless political forces and needed no principled basis for fashioning those exclusions. The courts will be forced to fashion their exclusions without the benefit of a similar process. But even if they succeed in some fashion, it would seem that any institutionally feasible categories are likely to be fundamentally at odds with the particularized inquiry ordinarily associated with "compelling state interest, least restrictive means" analysis. If, for example, as the Court held in Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), Massachusetts cannot foreclose public access to sex offense trials involving minors without a particularized inquiry concerning the specific victim and his or her personal situation, can it deny access to inter-agency and intra-agency memoranda without a particularized and judicially reviewable inquiry into the value of withholding each particular memorandum?
 
 D.
 
 55
 Houchins retains its precedential value. Initially, it should be pointed out that Houchins was not an aberration. There are a number of other cases which similarly indicate that the First Amendment guarantees no general access to government information. See, e.g., Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); and Saxbe v. Washington Post, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974). It was this caselaw that led Justice Stewart to observe in 1975:
 
 
 56
 There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy.... The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.
 
 
 57
 The Constitution, in other words, establishes the contest, not its resolution. Congress may provide a resolution, at least in some instances, through carefully drawn legislation. For the rest, we must rely, as so often in our system we must, on the tug and pull of the political forces in American society.
 
 
 58
 Stewart, Or of the Press, 26 Hastings L.J. 631, 636 (1975).
 
 
 59
 Not until Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 564, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980), did the Supreme Court recognize a First Amendment right of access to some government-controlled information. Richmond Newspapers, Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) and Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Press-Enterprise I ) comprise the trilogy of Supreme Court precedents upon which Times Leader relies as marking a one hundred and eighty degree turn in First Amendment jurisprudence. While these cases clearly represent a significant development, they do not expressly or impliedly overrule Houchins. These cases hold no more than that the government may not close government proceedings which historically have been open unless public access contributes nothing of significant value to that process or unless there is a compelling state interest in closure and a carefully tailored resolution of the conflict between that interest and First Amendment concerns.
 
 
 60
 Richmond Newspapers held that the public has a First Amendment right of access to criminal trials. Globe Newspaper held that a state statute closing all trials involving minor victims of sexual offenses violated this right. And Press-Enterprise I found that the First Amendment guarantee of an open trial extends to voir dire proceedings. Each of these cases applied the same approach for determining whether there was a First Amendment right of access to various aspects of the criminal trial. In the words of Justice Brennan, "resolution of First Amendment public access claims in individual cases must be strongly influenced by the weight of historical practice and by an assessment of the specific structural value of public access in the circumstances." Richmond Newspapers, 448 U.S. at 597-98, 100 S.Ct. at 2838-39 (Brennan, J., concurring in judgment). These words were endorsed by Chief Justice Burger in Globe Newspaper, 457 U.S. at 614, 102 S.Ct. at 2624 (Burger, C.J., dissenting), and there can be little doubt that this two tier analysis currently commands the allegiance of a majority of the Court.
 
 
 61
 This analysis may not be separated from its historical moorings, for the role of history in the access determination is integral. In United States v. Smith, 776 F.2d 1104 (3d Cir.1985), we analyzed the various opinions in Richmond Newspapers and recognized that a majority of the Court subscribed to an analysis that consisted of both an historical and a functional (or structural) strand. We further noted that the Court's emphasis on history had been reaffirmed in Globe Newspaper and Press-Enterprise I.
 
 
 62
 More recently, in First Amendment Coalition v. Judicial Inquiry & Review Board, 784 F.2d 467 (3d Cir.1986), we once again reviewed these Supreme Court precedents and noted the crucial role of a tradition of access:
 
 
 63
 Richmond Newspapers and the cases decided in its wake stressed the tradition of open trials in England and then later in colonial America. Since the Bill of Rights had been adopted "against the backdrop of the long history of trials being presumptively open," 448 U.S. at 575, [100 S.Ct. at 2826] the Court concluded that the First Amendment prohibits the "government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted." Id. at 576 [100 S.Ct. at 2827].
 
 
 64
 At 472. We went on in First Amendment Coalition to sustain Pennsylvania's denial of access to proceedings before its Judicial Inquiry and Review Board in cases where that Board had not recommended to the Pennsylvania Supreme Court that discipline be imposed on a judicial officer. In so holding, we relied upon the fact that proceedings before judicial disciplinary boards were "administrative proceedings [which], unlike conventional criminal and civil trials, do not have a long history of openness." At 472. To the contrary, we found that "the entity of the criminal justice system to which the Board is most akin" is the grand jury and noted that "tradition supports the secrecy of the grand jury." At 473.
 
 
 65
 Since oral argument in this case, the Supreme Court has once again reaffirmed the approach we followed in First Amendment Coalition. In Press-Enterprise v. Superior Court, --- U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), the Court noted that in cases dealing with an asserted First Amendment right of access, courts are to evaluate "two complementary considerations":
 
 
 66
 First, because a " 'tradition of accessibility implies the favorable judgment of experience' " ... [courts are to consider] whether the place and process has historically been open to the press and general public....
 
 
 67
 Second, [courts are to consider] whether public access plays a significant positive role in the functioning of the particular process in question.... These considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes. If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches.
 
 
 68
 Press-Enterprise II, --- U.S. at ----, 106 S.Ct. at 2740-41 (citations omitted).
 
 E.
 
 69
 We do not yet know whether the Supreme Court will apply its analysis of access in the context of judicial proceedings to the context of executive branch files. Assuming that it is to be so applied, however, under our case law and that of the Supreme Court, a party relying on the First Amendment as a source of a right of access to government-held information would normally have to allege and prove that access has traditionally been afforded to the public and that access "plays a significant positive role in the functioning of the particular process in question." Press-Enterprise II, --- U.S. at ----, 106 S.Ct. at 2740. In this case, Times Leader has alleged that access is necessary in order that the public may evaluate the "effectiveness with which the defendants and the D.E.R. are protecting the environment in Northeast Pennsylvania" and we assume, without deciding, that this allegation satisfies the structural value requirement of the applicable law. Amended Complaint at A12. Nevertheless, the district court's dismissal of Times Leader's amended complaint must be sustained because it has failed to allege that a tradition of public access exists.
 
 
 70
 In addition to alleging a demand and refusal, the amended complaint simply asserts:
 
 
 71
 The Times Leader has a right to inspect and copy the DER documents and records it has requested from these defendants in their official capacity since these DER documents and records are the official records of the DER, the public agency for which the defendants work and are themselves public records.
 
 
 72
 Appendix A12 (emphasis supplied). In order to clarify what it meant by characterizing the requested documents as "public records," Times Leader filed an affidavit indicating that other documents of a similar character had been produced for its inspection and, accordingly, that the Department had not consistently treated these categories of documents as non-public. Brief for Appellants, p. 14; Appendix A16-29. Even as so supplemented, Times Leader's allegations are insufficient to satisfy the historical access requirement of the First Amendment caselaw. Inconsistent government practice does not constitute the kind of historical tradition referred to in Press-Enterprise II, Richmond Newspapers and First Amendment Coalition. Moreover, Times Leader's papers refer solely to present, not historic practice.[27]
 
 
 73
 Finally, and most importantly, we believe the relevant historic practice in this case is not specifically that of Pennsylvania's Department of Environmental Resources. The First Amendment rights recognized by Richmond Newspapers, Globe Newspaper, and Press-Enterprise I and II were not defined by reference to the practices of any given state agency. In each of these cases, the Court looked not to the practice of the specific public institution involved, but rather to whether the particular type of government proceeding had historically been open in our free society. In Globe Newspaper, for example, the issue of whether Massachusetts had interfered with an historically recognized source of public information was resolved not by reference to its practice in sex offense trials, but rather by reference to the Anglo-American tradition with respect to criminal trials. Similarly, in First Amendment Coalition, this court looked not to the past practices of Pennsylvania's Disciplinary Board, but rather to the tradition of access to judicial disciplinary proceedings and grand jury proceedings generally. A contrary approach would not only lead to gross disparities in the content of the First Amendment rights recognized in these cases, it would also act as a powerful incentive to public officials to exercise their legally permissible discretion in favor of secrecy. Under such an approach, administrative decisions in favor of disclosure would hold the potential of conferring permanent, constitutional rights of access.
 
 
 74
 Because Times Leader has neither pleaded nor offered to prove the existence of a tradition of public access to the type of administrative records here in dispute, it cannot show that access in this situation enjoys "the favorable judgment of experience." Press-Enterprise II, --- U.S. at ----, 106 S.Ct. at 2742 (quoting Globe Newspaper, 457 U.S. at 605, 102 S.Ct. at 2619). As Times Leader cannot satisfy both "tests of experience and logic, a qualified First Amendment right of public access [does not] attach[ ]." --- U.S. at ----, 106 S.Ct. at 2741.
 
 F.
 
 75
 No federal court has perceived the need for the broad judicial intervention that Times Leader asks of us and no court has articulated a principled basis for fashioning the constitutional freedom of information act which that relief would necessarily entail. Moreover, such guidance as we have from the Supreme Court counsels against embarking on the suggested course. Accordingly, we will affirm the district court's dismissal of Times Leader's First Amendment right of access claim.
 
 III. EQUAL PROTECTION
 
 76
 Although the claim was not artfully pleaded, the district court read Times Leader's amended complaint as setting forth an equal protection claim. It described and disposed of that claim in the following paragraph:
 
 
 77
 Plaintiff also alleges that the information it seeks has been released to others. This, plaintiff alleges, violates its right to equal protection under the laws and "[s]uch selectivity by the defendants is a sufficient ground, standing alone, to warrant jurisdiction in this court over this dispute." ... Plaintiff asserts that because the information it seeks has been withheld and other information, unspecified by plaintiff, has been released to other people, an equal protection issue arises. The court disagrees. First, plaintiff does not identify the particular, insular group which is receiving unfair or discriminatory treatment. The only groups that can be discerned from plaintiff's averments are (1) those who have received the information they sought and (2) those who have not received the information they sought. Second, plaintiff does not even attempt to allege that the exact information was sought by all persons. Based upon these assertions, the Equal Protection Clause has not been implicated. The court, therefore, will grant defendants' Motion to Dismiss on this issue.
 
 
 78
 App. A84-85 (footnote omitted).
 
 
 79
 It is true that Times Leader fails to specify what information, denied to it, has been disclosed to others. Reasonable minds can, accordingly, differ as to whether Times Leader sufficiently articulated its claim before the district court. Nevertheless, we believe the allegations, accepted by the district court as setting forth the equal protection claim, may be read to claim that the D.E.R. has been discriminating between newsseekers, granting access to those favorably disposed to it while denying access to those whom it considers unfriendly. Moreover, at oral argument before us, Times Leader represented that there was reason to believe that there had been D.E.R. discrimination between newsgatherers since the district court's decision. Given the seriousness of this claim and the public interest in having it resolved on its merits, we conclude that the judgment should be vacated and the case remanded to the district court. This will afford Times Leader an opportunity to develop a record in support of its equal protection claim.
 
 IV. PENDENT STATE CLAIMS
 
 80
 Times Leader also appeals from the district court's dismissal of its pendent state law claims. However, as the district court noted, under Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Eleventh Amendment, absent state consent, precludes federal courts from entertaining pendent state law claims "against state agencies and officers seeking prospective injunctive relief for a violation of state law," Geis v. Board of Educ. of Parsippany-Troy Hills, 774 F.2d 575, 580 (3d Cir.1985). In this case, it is undisputed that Pennsylvania has not consented to be sued in a federal court. It follows that the district court correctly dismissed Times Leader's pendent state law claims.
 
 V. CONCLUSION
 
 81
 We will affirm the judgment of the district court insofar as it dismissed Times Leader's First Amendment and pendent state law claims. We will reverse that judgment, however, insofar as it dismissed the equal protection claim, and remand for further proceedings consistent with this opinion.
 
 
 82
 ADAMS, Circuit Judge, concurring.
 
 
 83
 Although I concur in the result reached by the Court, I write separately to explain why I view this case differently from First Amendment Coalition v. Judicial Inquiry and Review Board, 784 F.2d 467 (1986) (in banc), in which I dissented from the majority's rejection of an access claim. I also address, somewhat more fully than the majority, the argument advanced in Judge Garth's dissent that Capital Cities failed to state an equal protection claim in the district court.
 
 A.
 
 84
 The First Amendment plays a crucial role in the structure of government by fostering speech that is vital to a democracy. To the extent that it promotes such speech, access to government proceedings furthers important First Amendment values. Thus, whether access to a particular proceeding would encourage the dissemination of information and discussion beneficial to our society is a critical issue in determining whether the Constitution requires public access.
 
 
 85
 It is not, however, the sole issue. The Supreme Court has recognized a right of access only in cases where it has been shown both that access would enhance the functioning of the democratic process, and that the type of proceeding at issue has historically been open to the public. Indeed, it reiterated this two-pronged approach just a few short weeks ago. See Press Enterprise Co. v. Superior Court, --- U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986).
 
 
 86
 As Justice Brennan has written, a prior history of openness "has been viewed as significant not only 'because the Constitution carries the gloss of history,' but also because 'a tradition of accessibility implies the favorable judgment of experience.' " Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982) (quoting Richmond Newspapers, Inc. v. Virginia, 448 U.S. at 555, 589, 100 S.Ct. at 2814, 2834 (1980) (Brennan, J., concurring)). The two-part inquiry serves to ensure that the value of opening a particular proceeding "is recognized in both logic and experience." Id. at 606, 102 S.Ct. at 2620.
 
 
 87
 The opinion in First Amendment Coalition illustrates the import of history to a claim of access. The question there was whether the press and public had a right of access to the proceedings of Pennsylvania's Judicial Inquiry and Review Board. Judge Weis's majority opinion acknowledged the benefits promoted by access, but concluded that the press and public possessed no right of access because the judicial disciplinary process lacked a tradition of openness. I dissented, not because I believed no historical showing was necessary, but because I maintained one had been made. In my view, the relevant historical inquiry required consideration not only of the prior practices of Pennsylvania's Board, but also of the conduct of impeachment proceedings, the functional analogue of the modern-day judicial disciplinary panels.
 
 
 88
 One could envision a special case, perhaps, where access to governmental proceedings might be deemed so significant to a democratic government that the First Amendment would mandate access even without a showing of a tradition of openness. This, however, is not such a case. And under the analysis set forth in the Supreme Court's First Amendment jurisprudence, a showing of historical access appears essential in the usual situation.
 
 
 89
 Here, it is clear that there is no tradition of access to administrative agency records, which, as the majority notes, supra, at 1175 is the appropriate focus of the historical inquiry. I do not understand the Court's decision on this issue to be based solely upon a failure of pleading a tradition of access, as both Judges Garth and Gibbons suggest in their dissenting opinions. Even under this Court's heightened specificity requirement in civil rights complaints, see Frazier v. SEPTA, 785 F.2d 65, 68-69 (3d Cir.1986), the mere failure to plead a history of access would not merit dismissal of an otherwise adequate complaint.
 
 
 90
 The problem with the appellant's position, however, is that Capital Cities plainly cannot demonstrate a tradition of openness. Judge Gibbons proffers a historical showing that includes two elements: (1) a Pennsylvania statute, enacted in 1957, mandates that members of the public shall have access to agency records, with the exception of certain types of documents, such as agency investigative reports and materials subject to attorney-client privilege; and (2) Pennsylvania law permits the disclosure of all of the documents sought by the plaintiffs, with the arguable exception of materials covered by attorney-client privilege. This is not sufficient, in my judgment, to satisfy the historical test for a First Amendment access claim. In the context of criminal trials and pretrial hearings, for example, the Supreme Court has examined the historical practice of the states and the federal government, dating back to colonial times. The showing offered in support of Capital Cities' right of access is far too recent and far too narrow to bear the weight assigned to it.
 
 B.
 
 91
 In his dissent, Judge Garth takes issue with the Court's reversal of the district court's dismissal of Capital Cities' equal protection claim. The equal protection claim, he contends, warranted dismissal because it was not pleaded properly under any pleading standard. This position is not completely meritless. On the other hand, Capital Cities in its complaint cited the Fourteenth Amendment, contended that the agency's standards for granting or denying access are arbitrary and capricious, and demanded as relief that the state be ordered to "adopt a uniform policy to provide the public access to DER records in a manner consistent with constitutional and statutory guarantees...." Moreover, the district court understood Capital Cities to have asserted an equal protection claim. Although the complaint arguably approaches the outer edges of adequacy in stating the equal protection contention, I agree with the majority that it appears to have provided the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). And it recounts sufficient facts in support of this claim to satisfy the additional burden imposed in this Circuit in cases such as Frazier and Rotolo v. Borough of Charleroi, 532 F.2d 920, 923 (3d Cir.1976). Under these circumstances, I believe it is appropriate to permit Capital Cities to attempt to prove its averrment regarding an equal protection violation on a remand limited to this point.
 
 
 92
 GIBBONS, Circuit Judge, dissenting, with whom HIGGINBOTHAM, SLOVITER and MANSMANN, Circuit Judges, join:
 
 
 93
 Exercising plenary review of the grant of a motion to dismiss an amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the majority holds that: (1) the trial court properly determined that pendent state law claims for access to governmental information may not be considered by a federal court; (2) the court erred in dismissing claims based upon the equal protection clause of the fourteenth amendment; and (3) the court properly dismissed claims for access to information based upon the first amendment. I agree that the eleventh amendment, as reinterpreted in Pennhurst State School & Hospital v. Halderman (Pennhurst II), 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), precludes federal courts, in the absence of the state's consent, from entertaining pendent state law claims "against state agencies and officers seeking prospective injunctive relief for a violation of state law." Geis v. Board of Educatiion of Parsippany-Troy Hills, 774 F.2d 575, 580 (3d Cir.1985).[1] For reasons that I address more fully in Part IV below, I agree that the amended complaint states a claim for violation of the equal protection clause for which relief can be granted. I dissent from the majority's affirmance of the Rule 12(b)(6) dismissal of the claim for access to information based upon the first amendment.
 
 I.
 The Pleaded Facts
 
 94
 Since the appeal is from the grant of a Federal Rule of Civil Procedure 12(b)(6) motion, our review, as the opinion of the court acknowledges, is plenary. We must decide whether the verified complaint and supporting affidavit set forth a set of facts which, if proved at trial, would entitle Times Leader to the relief it seeks. See Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Times Leader can be expected to prove that in December of 1983, a major supplier of drinking water for Northeastern Pennsylvania, Pennsylvania Gas and Water Company, discovered that a substantial portion of its water supply was contaminated by giardia cysts. Ingestion of giardia cysts causes an intestinal illness in humans called giardiasis.[2] As a result of the contamination, over four hundred persons became afflicted with the disease. This outbreak led the Pennsylvania Department of Environmental Resources and the Pennsylvania Department of Health to make a public announcement about the contamination, and to place water use restrictions on 250,000 area water customers. The outbreak and the reactions of the two state departments were the subject of local, state, and national news coverage.
 
 
 95
 Following the giardiasis outbreak, Times Leader commenced an in-depth examination of the disease and its source. Because the Pennsylvania Department of Environmental Resources was the agency responsible for the enforcement of federal and state environmental laws respecting water quality, Times Leader undertook an extensive examination of its job performance and the job performance of its officials. During the course of that inquiry, Times Leader published approximately 400 news articles and opinion pieces. Some of the published materials expressed concern that political influence or other improper considerations affected the conduct of the Department over the years and resulted in the selective enforcement of environmental laws, particularly those regarding sewage discharges in Roaring Brook and Spring Brook Townships. Sewage discharges in those townships were the most likely sources of the giardia cyst contamination in the Pennsylvania Gas and Water Company watershed.
 
 
 96
 During the course of Times Leader 's investigation, it sought access to documents and records respecting the activities of the Department of Environmental Resources in the contaminated communities. Access to some documents at the Department's Northeast Regional Office was granted; however, some documents were withheld. The Department explained,
 
 
 97
 Department policy statewide allows for review of all files at Regional offices and in Harrisburg with the following exceptions:
 
 
 98
 1. Interoffice memorandum.
 
 
 99
 2. Documents relating to attorney-client relationships.
 
 
 100
 3. Citizen complaints.The rationale behind these exceptions is self-explanatory.
 
 
 101
 Letter from Mark R. Carmon, Community Relations Coordinator for the Pennsylvania Department of Environmental Resources to Times Leader (April 18, 1984), reprinted in Joint Appendix, at 33. Times Leader asked the Department for a copy of the statewide policy on withholding documents, but none could be found. An assistant counsel for the Department informed Times Leader that there was no formal Departmental policy, and that each regional office decided on its own what information would be disclosed. Thereafter the Department furnished Times Leader with a copy of its "Public Information General Policy and Guidelines." This document states that "all citizens shall be provided access to Departmental records and documents.... If such person desires copies of these documents or records, the Department shall impose a reasonable charge." Joint Appendix at 34-35. The document cross-references to two Pennsylvania statutes. The first defines public records, Pa.Stat.Ann. tit. 65, Sec. 66.1(2) (Purdon Supp.1985), and the second provides that "[e]very public record of an agency shall, at reasonable times, be open for examination and inspection by any citizen of the Commonwealth of Pennsylvania." Pa.Stat.Ann. tit. 65, Sec. 66.2 (Purdon 1959). The command in the second statute that the government afford citizens access to public records is qualified, however, by the following proviso to the first:
 
 
 102
 That the term "public records" shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties, ... [or 2] any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which is prohibited, restricted or forbidden by statute law or order or decree of court, or [3 any document] which would operate to the prejudice or impairment of a person's reputation or personal security, or [4 any document] which would result in the loss by the Commonwealth or any of its political subdivisions or commissions or State or municipal authorities of Federal funds, excepting therefrom however the record of any conviction for a criminal act.
 
 
 103
 Pa.Stat.Ann. tit. 65, Sec. 66.1(2).
 
 
 104
 Neither the quoted proviso nor any other Pennsylvania statute mandates nondisclosure of the four categories of materials excepted from the definition of public record. Even during the course of its investigation, Times Leader was shown inter-office memoranda, inspection reports, prosecution/enforcement action complaints (including those pertaining to criminal prosecutions), citizen complaints, investigation reports on citizen complaints, correspondence, enforcement recommendations, and other papers. Thus, as the Department interprets Pennsylvania law, the fact that a paper is not designated as a public record does not prevent its disclosure, but merely permits its nondisclosure in the unfettered absolute discretion of the agency official to whom a request for disclosure is made.
 
 
 105
 The Department, in a letter to Times Leader from Mark R. Carmon, its Community Relations Coordinator, explained,
 
 
 106
 Listed below is a reference list of the materials that were purged from our files on Spring Brook and Roaring Brook Townships. I do not intend to go into detail on this list as it would be doing the actual discovery work. I have attempted to give you a broad picture of what was deleted from your inspection and why.
 
 
 107
 File on Grella Litigation--Includes interoffice memos & Attorney Work Project [sic], ± 15 pieces
 
 
 108
 Elmbrook Public Service Corp. Files--Includes interoffice memos, and citizen complaints, ± 20 pieces
 
 
 109
 Roaring Brook Estates File--Includes legal action strategies and interoffice memos, ± 15 pieces
 
 
 110
 We strongly feel that your access to public files has been considerable and appropriate. The above-mentioned files were not made available to you and your staff under the three exception areas that we have discussed previously.
 
 
 111
 Letter from Mark Carmon to Times Leader (July 16, 1984), reprinted in Joint Appendix, at 38. The Department later gave Times Leader a more complete oral description of the documents and its reasons for withholding them. The documents date from the late 1960's up to and including 1984. They include: six to twelve reports of citizen complaints and of inspections made as a result thereof, three or four letters sent to or received from the office of the Department's legal counsel relating to litigation strategy, six memos generated by technical personnel discussing enforcement strategies or modes of approach to compliance problems, a large number of memos generated by technical personnel discussing the results of their investigation into the giardiasis problem and an undetermined number of uncategorized documents, the subject matter of which is unknown.
 
 
 112
 Times Leader alleges and has pleaded facts which, if proved, would lead to findings that there is no generally applicable state policy prohibiting disclosure of the bulk of the requested information, that similar information has regularly been disclosed, and that the Department's disclosure policy has been selectively implemented by Departmental personnel to deny access to individuals or news organizations whom the Department does not favor. Times Leader has, in short, pleaded a claim that information which under Pennsylvania law may be lawfully disclosed is selectively withheld for the purpose of manipulating the public's perception of the Department's performance.[3]
 
 II.
 
 113
 The Parties' Legal Contentions and the District Court Decision
 
 
 114
 The Commonwealth's position with respect to disclosure of materials in the possession of its agencies or political subdivisions is elemental. In its view, no one has any right of access to information in the possession of any branch, department, or political subdivision of a state except such as is conferred by the positive law of that state. No federal law bears upon the question. In Pennsylvania, the only such law is section 66.2 of title 65 of the Pennsylvania Statutes Annotated, see Pa.Stat.Ann. tit. 65, Sec. 66.2, and that law does not cover the four categories of documents listed in the proviso to section 66.1(2) of that title, see Pa.Stat.Ann. tit. 65, Sec. 66.1(2). State officials may, as a matter of grace, selectively withhold or disclose the documents mentioned in the proviso, as was done in this instance. But absent a willingness on their part to disclose, the public has no right of access to them at any time. Moreover, the Commonwealth argues, even if some of the withheld documents do not fall within the proviso in section 66.1(2) and therefore should have been disclosed under section 66.2, the eleventh amendment bars the district court from considering that claim. Thus, the Commonwealth urges, even a state statute mandating disclosure does not establish, for first amendment purposes, a public right of access.
 
 
 115
 Times Leader, on the other hand, contends as follows: (1) the first amendment guarantees it a right of access to at least some of the withheld information; (2) the Department's arbitrary and capricious policy with respect to disclosure deprives it and other citizens of the equal protection of the laws; and (3) there is pendent jurisdiction over its state law claims.
 
 
 116
 The district court accepted the Commonwealth's contention on each issue and dismissed the complaint. This appeal followed.
 
 III.
 
 117
 The First Amendment and Access to Information
 
 A.
 
 118
 Before I address Times Leader 's contention that the first amendment guarantees it a right of access to information in possession of the Pennsylvania Department of Environmental Resources, it is appropriate, in light of unfortunate dicta in the opinion of the court, to note certain issues that are not presented by this appeal. First, the Commonwealth does not contend, and the majority does not hold, that Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), has been overruled. The first amendment applies to the Commonwealth. Second, although Times Leader is a member of the Fourth Estate, it does not in this case contend for any right of access to information superior to that of the general public. It contends for the same right of access that, in its view, is guaranteed to all residents of the United States. Third, the appeal presents no issue of reasonable time, place, and manner restrictions upon access to information in the interest of such governmental interests as efficiency or economy. The Commonwealth does not contend that production of the withheld information would excessively burden the Department or divert public funds from their intended use. Indeed, the Department willingly undertook to permit inspection at its office of a large quantity of information in its files. The only significant burden or expense encountered was that of purging the raw files of that information the Department officials decided to withhold. The position of the majority apparently is that the Commonwealth has no burden of justifying any time, place, or manner restriction on access.
 
 
 119
 Fourth, the case does not involve any legislative determination that certain categories of governmental information must be withheld. The Pennsylvania statute is clear in this respect. It mandates disclosure of all public records, excepting from that mandate the four categories of records listed in section 66.1(2), but it does not prohibit the disclosure of the excepted records. The decision whether to disclose or not is by statute, and in practice so far as this record reveals, left to the discretion of the executive branch official possessing the information. Under the amended complaint Times Leader could prove that some information that is designated by statute as public was nevertheless withheld.
 
 
 120
 Fifth, the appeal is not before us in the posture in which the executive branch official has attempted to make any factual showing of a legitimate governmental interest that would be protected by nondisclosure.[4] Times Leader, it is true, has pleaded that three or four of the requested documents were generated by or sent to the Department's counsel, and thus there may be a viable claim of attorney-client privilege as to those documents. Even as to those documents, however, the Commonwealth has not made a specific assertion in the record before us of such a privilege. In addition, no factual assertion has been made, much less considered and resolved, that the remaining withheld information would prejudice an ongoing investigation, endanger a witness, disclose the identity of a confidential informant or breach a contract. Thus the case is not before us in a posture in which the Commonwealth asks us to balance the Time-Leader 's asserted right of access against identified, competing state or private interests. Nor is it before us in a posture in which we can identify any method of vindicating competing state or private interests by means less intrusive on the asserted right of access than total nondisclosure. We are confronted with the naked proposition that the first amendment guarantees no one any right of access to information possessed by the government under any circumstances. While some dicta in the opinion of the court suggests a willingness to accept that naked proposition, the precise holding in Part II E is narrower. The holding is only that the complaint insufficiently alleges a tradition of public access to the types of records here in issue.[5]
 
 B.
 
 121
 Before accepting either the naked proposition that the first amendment guarantees no one any right of access to information in the possession of the government or the narrower pleading holding of the majority, it is appropriate to consider what purposes animate the relevant portion of that amendment. The first amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. I.
 
 
 122
 Over the years, the animating purpose of the speech-press clause has been the subject of much discussion by justices and scholars alike. Justice Brandeis, in Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), related the speech-press clause to individual autonomy, noting that "[t]hose who won our independence believed that the final end of the State was to make men free to develop their faculties...." Id. at 375, 47 S.Ct. at 648 (Brandeis, J., concurring). Professor Emerson expressed the same thought when he wrote that freedom of expression is essential as a means of assuring individual self-realization. T. Emerson, The System of Freedom of Expression 6 (1970). Justice Holmes, echoing Thomas Jefferson, focused on the perhaps more pragmatic purpose of assuring competition in the marketplace of ideas. See Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes J., dissenting). See also Jefferson, First Inaugural Address, in 1 A Compilation of the Messages and Papers of the Presidents, 1789-1897, at 321-24 (J. Richardson ed. 1897). Professor Emerson also endorsed the view that the purpose of freedom of expression is to foster a marketplace of ideas when he wrote, "[F]reedom of expression is an essential process for advancing knowledge and discovering truth. An individual who seeks knowledge and truth must hear all sides of the question, consider all alternatives, test his judgment by exposing it to opposition, and make full use of different minds." Emerson, supra, at 6-7. Alexander Meiklejohn, whose writings upon the speech-press clause have been enormously influential upon members of the Supreme Court,[6] identified the first amendment as a corollary to the fundamental constitutional principle of self-government. Because the electorate exercises the power of self-government, though indirectly, he explained, the electorate must know and be totally free to discuss all matters concerning its government. See A. Meiklejohn, Free Speech and its Relation to Self-Government (1948); Meiklejohn, The First Amendment is an Absolute, 1961 Sup.Ct.Rev. 245; Meiklejohn, What Does The First Amendment Mean, 20 U.Chi.L.Rev. 461, 473 (1951-53).
 
 
 123
 But the earliest and certainly the most widely-accepted explanation of the animating purpose of the speech-press clause is that enunciated by its author, James Madison; namely, its value in serving as a restraint upon the abuse of power by public officials. Madison articulated that justification for the speech-press clause in the House of Representatives on June 8, 1789. See 1 Annals of Congress 432-42 (J. Gales ed. 1789), reprinted in 5 The Writings of James Madison 370-89 (G. Hunt ed. 1904). He reiterated that justification in a House debate in 1794. See 4 Annals of Congress 934 (1794). In 1799 he reemphasized the importance of the speech-press clause as a means for restraining abuse of power by government officials in his Report on the Virginia Resolutions in opposition to the Alien and Sedition Acts. Contrasting the situation in Great Britain where Parliament was deemed to be the sole guardian against usurpation of power by the executive, Madison observed.
 
 
 124
 In the United States, the case is altogether different. The people, not the government, possess the absolute sovereignty. The legislature, no less than the executive, is under limitations of power. Encroachments are regarded as possible from the one as well as from the other. Hence, in the United States, the great and essential rights of the people are secured against legislative as well as executive ambition. They are secured, not by laws paramount to prerogative, but by constitutions paramount to laws. This security of the freedom of the press requires that it should be exempt, not only from previous restraint of the executive, as in Great Britain but from legislative restraint also; and this exemption, to be effectual must be an exemption, not only from the previous inspection of licensers, but from the subsequent penalty of laws.... The nature of governments elective, limited, and responsible, in all their branches, may well be supposed to require a greater freedom of animadversion, than might be tolerated by the genius of such a government as that of Great Britain.... In the United States, the executive magistrates are not held to be infallible, nor the legislatures to be omnipotent; and both, being elective, are both responsible.
 
 
 125
 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787, at 569-70 (J. Elliot ed. 1881). It is Madison's justification for the speech-press clause--control of the abuse of governmental power--upon which Justice Brennan chiefly relied in the most significant of the modern first amendment cases, New York Times Co. v. Sullivan, 376 U.S. 254, 273-76, 84 S.Ct. 710, 722-23, 11 L.Ed.2d 686 (1964). Madison's control of abuse of governmental power justification has been referred to by a leading first amendment commentator as the checking value of the first amendment. See Blasi, The Checking Value in First Amendment Theory, 1977 A.B. Found. Research J. 523. That checking value and Alexander Meiklejohn's closely-related, self-government principle are most directly involved when those in power in government attempt to withhold information about their activities from the people to whom the government belongs.
 
 
 126
 The majority, while paying lip service to the value of information to the public, in essence rejects the checking value and the related, self-government principles as the most fundamental justifications for the speech-press clause. That rejection is nowhere better disclosed than in the statement:
 
 
 127
 It simply does not seem reasonable to suppose that the free speech clause would speak, as it does, solely to government interference if the drafters had thereby intended to create a right to know and a concomitant governmental duty to disclose.
 
 
 128
 At 1168. The sentence reveals a fundamental misconception of the very purpose of clauses in written constitutions placing limitations upon rather than conferring authority upon governments. The line of reasoning that because the first amendment only limits governmental action it therefore does not create individual rights or impose governmental duties is as illogical as the proposition that because the fourth amendment does not address invasions of privacy it should not be construed to require governmental acknowledgment of privacy rights.
 
 
 129
 The majority's attempt to develop an historical justification for its rejection of the checking value or self-government purpose of the speech-press clause is no more persuasive than its illogical reliance upon the fact that the clause only limits the government. The opinion of the court correctly notes that government secrecy was a major concern in several of the state ratification conventions that considered the 1787 constitution. The referenced materials, however, shed no light upon the question we address, for they antedate the first ten amendments, which were proposed by the First Congress in response to those and other concerns about the power of the central government. With the arguable exceptions of the second and tenth amendments, which may address federalism concerns, all clauses of the bill of rights, but especially the speech-press clause, impose limitations upon governmental power in favor of individual liberty.
 
 
 130
 The reference to the early practice of the Senate and House of Representatives adds little. The journal clause in Article I, Section 5, which antedates the first amendment, lays down a general disclosure rule, "excepting such parts as may ... require secrecy." U.S. Const. art. I, Sec. 5. The first amendment is not absolute. It accommodates the need for governmental secrecy, both legislative and executive, in certain instances. I would not suppose, however, that if presented with the question the Supreme Court would defer totally to Congress with respect to the secrecy of legislative proceedings. Rather it would, as it has frequently done, accommodate the competing governmental interest in secrecy and the values of the first amendment. See New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).
 
 
 131
 The weakest reed in the majority's attempted historical justification for rejecting the checking value and the related, self-government principle as the most fundamental justifications for the speech-press clause is the strange reliance upon Jefferson's assertion of executive privilege in the trial of Aaron Burr. That reliance is strange because the instance presented the unusual spectacle of the executive branch seeking a sanction through the Article III courts, while simultaneously asserting the absolute power to withhold exculpatory information.[7] Had Burr been convicted by a jury, rather than acquitted, there is little doubt that the Supreme Court would have exercised judicial review over Jefferson's grandiose notions of executive privilege. Jefferson's executive privilege extremism in the Burr case has since been unanimously rejected as precedential in the only case in which any president relied upon it to claim the power to withhold information in a criminal proceeding. See United States v. Nixon, 418 U.S. 683, 703-13, 94 S.Ct. 3090, 3105-10, 41 L.Ed.2d 1039 (1974).
 
 
 132
 Finally, the majority relies upon the recent legislative initiatives such as the Freedom of Information Act of 1967, as amended, 5 U.S.C. Sec. 552 (1984), the Privacy Act of 1974, as amended, 5 U.S.C. Sec. 552a (1984), the Government in Sunshine Act of 1976, 5 U.S.C. Sec. 552b (1982), and similar state statutes. It is undoubtedly true that many of these changes "may be traced to the greater public need for such information that has accompanied the growth of government at all levels." At 1170. It is not true, however, that legislative implementation of the citizens' right of access to that information needed for intelligent self-government suggests that the first amendment does not protect that right. The content of the referenced legislation might well inform courts when they are called upon to strike the appropriate balance between governmental secrecy and the first amendment right to information, a task not presented in this record. Legislative initiative in acknowledging a right of access cannot, however, be construed as a negation of that right.
 
 
 133
 The theme of the majority opinion is to reject the information role of the speech-press clause in citizen participation in self-government in favor of a model of government in which elected executive or legislative branch officials are deemed to have been delegated the power to decide for us what we need to know. That "big brother" approach to democratic government carries with it the seeds of destruction of participatory democracy, for it places in the hands of those chosen for positions of authority the power to withhold from those to whom they should be accountable the very information upon which informed voting should be based. One cannot vote to throw the rascal out until informed of rascality. Thus the majority's approach to the structural purposes of the first amendment is profoundly anti-democratic.
 
 C.
 
 134
 Since New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), it has been clear that, just as Madison urged in 1799, the speech-press clause restrains government with respect to both prior restraints and post-publication sanctioning, although not in the same manner nor to the same degree.[8] Long before the Court adopted Madison's suggestion that the clause applied to post-publication sanctions, however, it was settled doctrine that prior restraints upon the dissemination of information came laden with an extremely high burden of justification. The seminal case announcing the general presumption against the validity of prior restraints is Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Although from time to time it has not been unanimous with respect to whether a government imposing such a restraint has satisfied the heavy burden of justification, the Court has never waivered from the basic rule. See, e.g., New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971).
 
 
 135
 Considering the speech-press clause in light of its fundamental relationship to self-government and to control of the abuse of governmental power, the ultimate prior restraint by government upon the speech that is the core concern of the clause is ignorance of governmental affairs imposed by nondisclosure. If Times Leader had been required to submit for prior approval what it intended to publish about the Department, no one would doubt that the speech-press clause was violated. If the Department had by rule or practice permitted access to records on the condition that only such information as it approved of could be published, few would doubt that the rule or practice operated as a forbidden prior restraint. The selective nondisclosure of governmental records as a practical matter imposes, with respect to governmental activities, a prior restraint having the identical effect. The people cannot discuss governmental activities of which they are kept in ignorance. They cannot make the choices required of voters by our system of self-government on the basis of information about the activities of those in power if information about those activities is withheld from them. Indeed, the Commonwealth's position presents the problem of prior restraint in its most pernicious form because it permits the selective release of information in the unbridled discretion of those holding the reigns of governmental power. Thus, it presents the possibility--indeed virtually the certainty--that such public debate about governmental affairs as does occur will be distorted by governmental interference such as that described by the Department's Community Relations Coordinator in this record as "purging" files.
 
 D.
 
 136
 The question, then, is whether government may, consistent with the speech-press clause, without offering any justification whatever for doing so, impose the ultimate prior restraint of imposed ignorance about its affairs simply by refusing access to information in the possession of public officials. The majority holds that it may. The governing case law quite plainly is otherwise.
 
 
 137
 We may set to one side those cases, on which the Commonwealth chiefly relies, dealing with the distinct question whether the press has a separate and superior right to information beyond that shared by the public at large. Time-Leader does not in this case seek such a preferred position. Thus, the rejections in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), and Houchins v. KQED, Inc., 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) of press arguments for a favored position that would overcome the incidental restraining effects of other valid governmental objectives lend no support to the Commonwealth's position. Indeed, in those very cases, the court was careful to note that there was no absolute governmental right to withhold information.
 
 
 138
 In Branzburg v. Hayes, for example, while rejecting the contention that members of the institutional press are more free than other persons from the obligation to give testimony, Chief Justice Burger carefully noted, "We do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press would be eviscerated." 408 U.S. at 681, 92 S.Ct. at 2656. In Pell v. Procunier, while rejecting the contention that the press have a greater right of access to inmates than is afforded by California's prisoner visitation regulations, Justice Stewart justified the resulting restraint as no more than a reasonable time, place, and manner regulation of communicative activity, an issue not presented in this case. He was careful to observe, however, that
 
 
 139
 [t]he constitutional guarantee of a free press "assures the maintenance of our political system and an open society" ... and secures "the paramount public interest in a free flow of information to the people concerning public officials".... By the same token, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." ... Correlatively, the First and Fourteenth Amendments also protect the right of the public to receive such information and ideas as are published.
 
 
 140
 417 U.S. at 832, 94 S.Ct. at 2809 (citations omitted). Plainly, had the purpose of California's regulations been to withhold information about prisons rather than to regulate communication in a manner consistent with prison security, the result in the case would have been otherwise. The same is true of the regulations of the Federal Bureau of Prisons considered in Saxbe v. Washington Post Co., decided on the same day.
 
 
 141
 The Commonwealth urges, and the majority reasons, that the careful reservations articulated in Branzberg, Pell, and Saxbe about the first amendment protection of access to public information were swept aside in Houchins v. KQED, Inc.. Both rely on dicta in the plurality opinion of Chief Justice Burger that arguably may be construed as suggesting that there is no first amendment protection for the newsgathering function. See 438 U.S. at 9, 13-15, 98 S.Ct. at 2593, 2596-97. Assuming that the Chief Justice meant some of the ambiguous statements in the plurality opinion to be so construed, the plurality opinion by three members does not represent the view of a majority of the court. Only seven justices[9] participated and as subsequent cases make clear, the views expressed by Justice Stevens for himself and Justices Brennan and Powell that "the First Amendment protects not only the dissemination but also the receipt of information and ideas," 438 U.S. at 19, 30, 98 S.Ct. at 2599, 2604 (Stevens, J., dissenting, with whom Brennan, J. and Powell, J. joined), now command a substantial majority. "Without some protection for the acquisition of information about the operation of public institutions such as prisons by the public at large," Justice Stevens wrote, "the process of self-government contemplated by the Framers would be stripped of its substance." Id at 32, 98 S.Ct. at 2605. (footnote omitted). Moreover, the issue in Houchins was physical access by the press to a prison and thus to a place in which security concerns are paramount, and the holding went no further than to reject a preferred position for the press with respect to time, place, and manner restrictions on access to information. Id. at 15-16, 98 S.Ct. at 2597.
 
 
 142
 Restraints on access to information that were not merely time, place, and manner restrictions, but attempts to withhold information were first addressed in Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). The case involved access to a pretrial judicial proceeding, and thus involved the inevitable tension between those constitutional and statutory provisions designed to afford a fair trial and the fundamental disclosure policy enshrined in the speech-press clause. The opinion of the Court discussed the claimed right of access principally in terms of the public trial guarantee in the sixth amendment, and balanced the temporary denial of access against the risk of disclosure to potential jurors of inadmissible evidence. Justice Stewart assumed, arguendo, that there was a first amendment right of access, and wrote,
 
 
 143
 Once the danger of prejudice had dissipated, a transcript of the suppression hearing was made available. The press and the public then had a full opportunity to scrutinize the suppression hearing. Unlike the case of an absolute ban on access, therefore, the press here had the opportunity to inform the public of the details of the pretrial hearing accurately and completely. Under these circumstances, any First and Fourteenth Amendment right of the petitioner to attend a criminal trial was not violated.
 
 
 144
 443 U.S. at 393, 99 S.Ct. at 2912. Justices Stevens and Powell indicated that in their view the first amendment protected access to governmental information. See id. at 391-93, 99 S.Ct. at 2911-12. (Stevens, J., joining in the opinion of Justice Stewart); 379-403, 99 S.Ct. at 2905-17 (Powell, J., concurring).[10] Thus, it is clear from DePasquale that there was no majority support for any dicta in Houchins that the first amendment did not protect the public's right of access to governmental information. The majority's statement that "a majority of the seven judge Court in Houchins held that there is no First Amendment right of press access to government-held information and, in the process, rejected the idea of a First Amendment right of public access," at 1171, is plainly misleading.
 
 
 145
 What was implicit in DePasquale became explicit in Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580-81, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980), in which the Court held that there was a public right, shared by the press, to attend criminal trials. That right, the Court held, was protected by the first amendment. Thus, it could be restricted only if the government could demonstrate a compelling interest justifying the denial of access. Id. at 581, 100 S.Ct. at 2829. In contrast to some of the language he used in Houchins, Chief Justice Burger explicitly recognized that the speech-press clause "prohibit[s] government from limiting the stock of information from which members of the public may draw." Id. at 576, 100 S.Ct. at 2826. Indeed, he expressly adopted the Madisonian version of the purpose animating the amendment, observing that the speech, press, and assembly clauses "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." Id. at 575, 100 S.Ct. at 2826. Criminal trials were identified as only one aspect of government. Id. In his concurring opinion in Richmond Newspapers, Justice Stevens described the majority opinion as an unequivocal holding that "arbitrary interference with access to important information is an abridgment of the freedoms of speech and of the press protected by the First Amendment." Id. at 583, 100 S.Ct. at 2830. The several other concurring opinions all endorsed the holding that the first amendment protects access to government information. Id. at 584, 100 S.Ct. at 2831 (Brennan, J., with whom Marshall, J., joined); 598, 100 S.Ct. at 2839 (Stewart J., concurring); 601, 100 S.Ct. at 2840 (Blackmun, J., concurring).[11]
 
 
 146
 Two years after Richmond Newspapers, the Court once again confronted the issue of governmental action designed to deny access to information about governmental affairs. In Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Court addressed a Massachusetts statute providing for mandatory exclusion of the press and the public from trials involving sexual offenses against minors. In the opinion of the Court, Justice Brennan related the right of access protected by the first amendment to the Madisonian values he had previously relied upon in New York Times Co. v. Sullivan. Id. at 604, 102 S.Ct. at 2618. He went on to hold that the test for measuring the validity of a restraint upon access was the same as that traditionally applied in other prior restraint contexts. The restraint must be justified by a compelling governmental interest, and must be narrowly tailored to serve that interest in the manner least intrusive upon first amendment rights. Id. at 606-10, 102 S.Ct. at 2619-22. More recently in Press-Enterprise v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Court, considering the question whether the public could be excluded from voir dire proceedings, held that the public's right of access could be overcome only "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Id. at 510, 104 S.Ct. at 824.
 
 
 147
 The cases from DePasquale through Press-Enterprise thus make clear that a governmental restriction on access to information about governmental matters presents a first amendment question, and that such a restriction, like any other prior restraint, can be sustained only if it demonstrably advances significant governmental interests and is narrowly tailored to serve those interests. See also United States v. Smith, 776 F.2d 1104 (3d Cir.1985); Publicker Industries, Inc. v. Cohen, 733 F.2d 1059 (3d Cir.1984).
 
 E.
 
 148
 Although the judges in the majority are plainly uncomfortable with the Supreme Court's acknowledgment in the access cases discussed above of the structural first amendment purpose of informing the electorate, they can hardly claim to be free to reject those cases outright. Instead, adopting the position urged by the Commonwealth, they point to language in Press-Enterprise suggesting that historical practice with respect to access is significant. Arguably the language relied upon applies only to access to various stages of the judicial process rather than to access to records of the executive or legislative branches of government. I am willing to assume, arguendo, however, that historical practice is relevant to denials of access in those branches of government as well.[12] It is one thing to recognize, as the court did with respect to the first amendment right of access to judicial proceedings, that historical practice may be a relevant consideration in determining the government's countervailing interest in secrecy. It is quite another to impose it as an affirmative pleading requirement upon the party asserting the protection of the first amendment. No opinion from DePasquale through Press-Enterprise can be read to ordain any such pleading requirement. Quite the contrary. In recognizing a first amendment right of access, the justices in the majority have made it clear that, consistent with long-settled first amendment jurisprudence, that right can be denied only if the government establishes a compelling interest justifying the denial.
 
 
 149
 The majority's distortion of the holdings from De Pasquale through Press-Enterprise into a pleading standard that they simply do not announce is understandable. Done otherwise, the majority, although uncomfortable with the structural first amendment purpose that those cases acknowledge, would have had to decide if the burden of justification of the restraint, historical or otherwise, was placed, where it is placed in all other first amendment contexts, and would have had to balance the government's interest in secrecy against the need for openness and the relevant historical practices suggesting openness. But the government in this instance made no attempt to demonstrate any compelling governmental interest in secrecy. Thus the majority can refer to no such interest. That being the case, the majority simply erects a pleading bar and thereby sidesteps its obligation under conventional first amendment jurisprudence to examine the restraint and to determine whether it is narrowly tailored to the identified governmental interest. In sum, by the device of imposing upon Times Leader a totally unprecedented burden of proving prior historical practice--plainly a matter of justification for a restraint on first amendment rights on which the government bears the risk of nonpersuasion--the majority has evaded the responsibility, plainly imposed in Press-Enterprise, that it "articulate findings with requisite specificity" and "consider alternatives to closure and to total suppression." 464 U.S. at 513, 104 S.Ct. at 826.
 
 
 150
 Not only is the majority's ingenious invention in Part III E of the opinion of the court inexcusably inconsistent with long-settled first amendment pleading rules, but the majority's application of this pleading invention is on this record totally indefensible. As noted in Part I above, Rule 12(b)(6) motions may be granted only if the verified complaint and supporting affidavits set forth no set of facts which, if proved at trial, would entitle the plaintiff to relief. See Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Even assuming that the plaintiff has the burden of proving a history of access, the pleadings, read as Conley v. Gibson requires that they be read, would permit proof of such practice. As noted in Part III A above, Times Leader has pleaded that Pennsylvania law permits the disclosure of all of the requested information with the possible exception of those documents that are arguably covered by the attorney-client privilege. Moreover Times Leader has pleaded that under Pennsylvania law the great bulk of the requested materials are classified by Pennsylvania law as public records. It is true that Pennhurst II precludes the grant by a federal court of a remedy predicated upon the Pennsylvania statutes. That holding does not suggest, however, that the statutes are irrelevant to the issue of historical rights of access. Plainly the Pennsylvania statutes are the best evidence of historical practice, and they may not be disregarded. Thus even accepting the majority's erroneous invention of a new pleading requirement for first amendment cases, the opinion of the court is wrong because it misapplies this pleading standard.
 
 F.
 
 151
 While the Supreme Court has thus far recognized a first amendment right of access in cases involving judicial proceedings, application of that right to the executive and legislative branches is an a fortiori case. In Alexander Bickel's felicitious phrase, the judiciary is the least dangerous branch.[13] The need for careful scrutiny of the activities of the executive and legislative branches is heightened by the fact that they possess far more power than the judiciary, and thus far more capacity to abuse power.
 
 
 152
 I would hold, therefore, that the district court misread the case law from De Pasquale through Press-Enterprise and erred in holding that Times Leader has failed to state a claim upon which relief can be granted under the first amendment. The burden is on the Commonwealth to tender a compelling governmental interest to justify its denial of access or its reasonable time, place, or manner restriction, if the restriction in this case can be classified as one, and it neither pleaded nor proved either. The majority's ingenious invention of a new first amendment pleading rule is bad law and, even if it is not bad law, in this case it is misapplied law. The dismissal of Times Leader's first amendment claim should be reversed.
 
 IV.
 Equal Protection Claim
 
 153
 I agree with the majority that Times Leader 's equal protection claim should be reversed. Applying the pleading standards applicable to a Rule 12(b)(6) motion to dismiss, I have no doubt that Times Leader 's pleading would permit it to prove that the Department of Environmental Resources has discriminated among newsgatherers on the basis of a perceived favorable or hostile editorial stance. Such proof certainly would entitle Times Leaders to relief for a violation of the equal protection clause.[14] See, e.g., Niemotko v. Maryland, 340 U.S. 268, 272, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1950) ("The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body."); Bonner-Lyons v. School Committee of Boston, 480 F.2d 442, 444 (1st Cir.1973) ("once a forum is open for the expression of views ... under the equal protection clause neither the government nor any private censor may pick and choose between those views which may or may not be expressed").
 
 
 154
 I write separately to note, however, that the fundamental rights body of equal protection case law is an independent basis for reversing the dismissal of Times Leader 's first amendment claim. In a great variety of contexts the Supreme Court has recognized that restrictions upon the exercise of constitutionally protected rights may be justified, even if the government's interests are legitimate and substantial, only if the restrictions are narrowly tailored to their legitimate objectives. That rule has been applied to restrictions upon expression, see Police Department of Chicago v. Mosley, 408 U.S. 92, 98, 102, 92 S.Ct. 2286, 2291, 2293, 33 L.Ed.2d 212 (1972), and upon the free exercise of religion, see Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). There is no reason why it should not be applied, as well, to the first amendment right of access here involved. The Pennsylvania statutes dealing with access to information, as construed by the Commonwealth defendants, are under the standards of these cases facially invalid. Rather than being narrowly tailored to legitimate objectives, they permit unbridled executive branch discretion. This is an entirely separate ground for reversal.
 
 
 155
 Times Leader could, on the basis of the pleadings, prove not only unbridled discretion to release or withhold information falling within section 66.1(2), a matter of facial invalidity, but also the release of information to persons deemed by government officials to be supportive and the withholding of information from persons deemed critical. Singling out persons for adverse treatment on the basis of their perceived relationship to the regime in control of the government would in my view qualify as an application of the Pennsylvania statute "with a mind so unequal and oppressive as to amount to a practical denial by the State of that equal protection of the laws which is secured to ... all ... persons," by the fourteenth amendment. Yick Wo v. Hopkins, 118 U.S. 356, 373, 6 S.Ct. 1064, 1072, 30 L.Ed. 220 (1886).
 
 
 156
 Since the statutory scheme affecting a first amendment right is not narrowly tailored to meet a legitimate governmental interest, it is facially invalid. Even if it were valid, Times Leader has pleaded that it has been applied in a manner that violates the equal protection clause. Thus for two independent reasons I join in the judgment reversing the dismissal of Times Leader 's equal protection claim.
 
 GARTH, Circuit Judge, dissenting:
 
 157
 Although I agree with the majority that Times Leader has failed to state a claim under the first amendment compelling a right of access to the state executive branch documents and records sought here, I nevertheless am compelled to dissent from the majority's judgment. I do so because the majority has vacated the district court's judgment and has remanded so that Times Leader may develop a record in support of its so-called equal protection claim.
 
 
 158
 The district court, which had been faced with DER's 12(b)(6) motion to dismiss, correctly held that no cause of action for which relief could be granted was presented by Times Leader's complaint. Because no trace of an equal protection claim can be found in that complaint, I find no justification for this court to vacate the district court's order. Since no equal protection claim was pleaded or even intimated in the complaint, I can find no principled basis for the majority's action. I therefore dissent.
 
 I.
 
 159
 In its amended complaint[1], Times Leader complained it had been denied access to various documents and records and that that denial violated the "public's right to know about the effectiveness with which the defendants and the DER are protecting the environment in Northeast Pennsylvania." Complaint p 11, App. 12a. Times Leader also alleged that DER had engaged in a practice of denying public access to records. Finally, the complaint, obviously referring to DER's alleged denial of public access, stated that:
 
 
 160
 The standards utilized by the Department of Environmental Resources to grant or deny access to the public to records of DER are arbitrary and capricious.
 
 
 161
 Complaint p 13, App. 13a.
 
 
 162
 Thus, no allegation in the complaint charges selectivity by the defendants in their distribution of information. The mere allegation that DER employed "arbitrary and capricious" disclosure policies can by no stretch of the imagination constitute a well-pleaded cause of action under the equal protection clause of the fourteenth amendment. At the least, such a cause of action would require some indication that disclosure to someone at sometime had been made and that such disclosure discriminated against the complainant or otherwise constituted a denial of equal protection. No such allegation appeared in Times Leader's original complaint nor in its amended complaint.
 
 
 163
 The district court dismissed the complaint solely on the basis that Times Leader was not entitled to a first amendment right of access. That was the only claim ruled on by the district court. While it is true that the district court's opinion, for reasons which do not appear on the record, addressed in dictum a fourteenth amendment equal protection claim, that discussion cannot provide the foundation for a cause of action where the complaint is totally devoid of any language which could even remotely be construed to state a claim under the equal protection clause. District Court op. at App. 84-85. The majority's reliance not on its own reading of the complaint but on the district court's discussion of an equal protection claim that was never pleaded, is unprecedented.
 
 
 164
 The majority opinion acknowledges that Times Leader "... fails to specify what information, denied to it, has been disclosed to others", Maj. op. at 1176, and indeed nothing appears which indicates that Times Leader "... articulated its [equal protection] claim before the district court." Id. Significantly, the majority opinion does not even claim that the allegations of Times Leader's complaint set forth an equal protection claim. Rather, without referring to the particular allegations (of which there are none), the majority relies on the district court's equivocal treatment of an equal protection claim as a substitute for its own examination of Times Leader's complaint. The majority opinion, apparently recognizing the weakness of this position, then seeks to buttress its holding by stating "... at oral argument before us, Times Leader represented that there was reason to believe that there had been D.E.R. discrimination between newsgatherers since the district court's decision." Maj. op. at 1176.
 
 
 165
 Obviously, matters occurring after the district court's decision could not have been before the district court when the district court ruled. Moreover, oral arguments made before a Court of Appeals can not cure a deficient cause ofaction by attempting to supply those elements of a cause of action which are not stated in the complaint.
 
 II.
 
 166
 As I have observed, the record does not disclose why the district court even addressed an equal protection claim.[2] Significantly, however, if the issue that the district court found necessary or desirable to discuss arose because of assertions made in Times Leader's motion for a preliminary injunction (a motion which was never heard or ruled upon), the district court in any event found such pleading to be deficient. Moreover, the district court correctly noted that no equal protection claim was "alleged" because Times Leader did "not identify the particular, insular group which is receiving unfair or discriminatory treatment", nor did Times Leader "even attempt to allege that the exact information was sought by all persons." District Court op. at App. 85a.
 
 
 167
 It is well-established that a plaintiff seeking to assert an equal protection claim must at the very least allege that "he is receiving different treatment from that received by other individuals similarly situated." Kuhar v. Greensburg-Salem School District, 616 F.2d 676, 677 n. 1 (3d Cir.1980). "A person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." Huebschen v. Department of Health and Social Services, 716 F.2d 1167, 1171 (7th Cir.1983). See Price v. Cohen, 715 F.2d 87, 91 (3d Cir.1983) ("To establish a violation of the equal protection clause, a plaintiff must show that the allegedly offensive categorization invidiously discriminates against the disfavored group.") Times Leader's complaint fails to provide any allegations which even suggest these basic and rudimentary components of an equal protection claim.[3]
 
 
 168
 The majority's decision to vacate and remand on the ground that an equal protection claim has been pleaded where no such allegations appear in the complaint does a tremendous disservice to the district court which had before it a fatally deficient pleading. Even under the most generous reading of Times Leader's complaint, an equal protection claim cannot be found. So that there can be no misunderstanding as to what the complaint in fact stated, I reproduce in full the amended complaint in an appendix to this opinion. I defy the most liberal pleader to read that complaint from end to end and find even the semblance of an equal protection claim.
 
 III.
 
 169
 Moreover, the defendants could not possibly be put on notice as to the nature of an equal protection claim based on a reading of the complaint. Nowhere are the specifications which Times Leader alleges to constitute discriminatory behavior set forth in even the most general terms so as to enable the defendants to file an appropriate answer to defend this action.
 
 
 170
 After all, the district court, in ruling on the defendant's motion to dismiss, and this court in reviewing that ruling, have not been confronted with an unartfully drawn pro se complaint. Even if we had been, this complaint would have been fatally deficient. A fortiori, where the complaint was drafted not by an unschooled pro se litigant, but by trained counsel, I can find no excuse for our acting as co-counsel and structuring the complaint as we would have drawn it, but as counsel has not.
 
 
 171
 As Chief Judge Aldisert recently wrote in dissent in a case where this court reversed the district court's 12(b)(6) dismissal of a Sec. 1983 civil rights complaint: "I see no reason to torture and twist controlling case law to accommodate plaintiffs' counsel. I would not reward slipshod lawyering by making [the district court judge] the patsy for counsel's derelictions and by branding the judge's action as reversible error." District Council 47 v. Bradley, 795 F.2d 310, 316 (3d Cir.1986) (Aldisert, C.J., dissenting).
 
 
 172
 Because I read Times Leader's complaint as I believe complaints should be read, that is, in accordance with the words and terms found in the complaint, and because I have not deemed it an appropriate judicial exercise to conjure up a claim which Times Leader might have wished to state, but which it clearly did not, I find no reason for vacating the district court's judgment and remanding so that Times Leader may now seek to develop a record in support of its chimerical equal protection claim. Times Leader has never sought a second amendment of its complaint, and I find no justification asserted by Times Leader for granting it an opportunity to develop still another record at this late stage of this proceeding. Indeed, even when arguing before us, Times Leader did not seek that opportunity.
 
 
 173
 Thus, I would hold that the district court correctly dismissed the complaint that was before it for failure to state a cause of action upon which relief could be granted. Since the majority refuses to read and rule on the same complaint that the district court was obliged to read and rule on, I dissent.
 
 APPENDIX
 
 174
 CAPITAL CITIES MEDIA, INC., t/d/b/a THE WILKES-BARRE TIMES
 
 
 175
 LEADER and ROBERT SCHEIER, Assistant City Editor, Plaintiffs
 
 
 176
 Vs.
 
 
 177
 JAMES W. CHESTER, Regional Director, Northeast Region,
 
 
 178
 Pennsylvania Department of Environmental Resources and MARK
 
 
 179
 R. CARMON, Community Relations Coordinator, Northeast
 
 
 180
 Region, Pennsylvania Department of Environmental Resources,
 
 
 181
 and NICHOLAS DEBENEDICTIS, Secretary, Pennsylvania
 
 
 182
 Department of Environmental Resources, and PENNSYLVANIA
 
 
 183
 DEPARTMENT OF ENVIRONMENTAL RESOURCES, Defendants
 
 CIVIL ACTION NO. 84-1024 of 1984
 
 184
 UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 
 Aug. 10, 1981
 AMENDED COMPLAINT
 
 185
 1. The jurisdiction of this Court is invoked pursuant to 42 USC Sections 1983, 1985, 28 USC Sections 1331, 1343, the First Amendment of the U.S. Constitution, the Fourteenth Amendment of the U.S. Constitution. Ancillary and pendant jurisdiction is invoked for state causes of action which arise under Article I Section 7 of the Pennsylvania Constitution and 65 P.S. Section 66.1, et seq. (The Pennsylvania Right to Know Law).
 
 
 186
 2. The plaintiffs are Capital Cities Media, Inc., t/d/b/a The Wilkes-Barre Times Leader ("Times Leader"), a newspaper of general circulation in Northeast Pennsylvania with offices located at 15 North Main Street, Wilkes-Barre, Pa. and Robert Scheier, an Assistant City Editor for the Times Leader.
 
 
 187
 3. The defendants are James W. Chester, the Regional Director of the Northeast Region of the Pennsylvania Department of Environmental Resources ("Chester"; "DER") and Mark R. Carmon, Community Relations Coordinator for the Northeast Region of the Pennsylvania Department of Environmental Resources ("Carmon"; "DER"). The defendants have offices at 90 East Union Street, Wilkes-Barre, Luzerne County, Pa. At all times material hereto, the defendants have been acting in their official capacities and under color of state law. Defendant Nicholas DeBenedictis is the Administrative Head of the Pennsylvania Department of Environmental Resources and has the title of Secretary. His office address is c/o Department of Environmental Resources, Fulton Building, 9th Floor, P.O. Box 2063, Harrisburg, Pennsylvania, 17120. Defendant Department of Environmental Resources ("DER") is an agency of the executive branch of the Commonwealth of Pennsylvania created by statute approved on December 3, 1970 as an Amendment to the Administrative Code, 71 P.S. Section 61, et seq.
 
 
 188
 4. In December, 1983, the Pennsylvania Gas & Water Company, a major supplier of drinking water to the public in Northeast Pennsylvania, experienced contamination of a substantial portion of its water supply by giardia cysts. This contamination resulted in over four hundred (400) area residents being infected with an intestinal disease known as giardiasis, an illness similar in effects to intestinal flu. Two hundred fifty thousand (250,000) customers of the Pennsylvania Gas & Water Company were placed under water use restrictions. This incident received local, state and national news coverage.
 
 
 189
 5. The defendants and the branch of government by which they are employed have the responsibility to enforce various federal and state environmental laws and regulations, among them laws and regulations relating to the prevention of sewage discharges and the contamination of public water supplies.
 
 
 190
 6. Since the outbreak of giardiasis, the Times Leader has conducted an in-depth examination of the giardiasis outbreak, including an examination of the effectiveness with which the defendants and the DER have fulfilled their responsibilities. The Times Leader examination has resulted in the publication of numerous news articles in connection with this problem. The Times Leader examination and publication is continuing.
 
 
 191
 7. As part of this ongoing examination, the Times Leader has requested numerous DER documents and records from the Defendants, only some of which have been provided.
 
 
 192
 8. The defendants have refused to make a variety of DER documents and records available to the Times Leader, despite a request to do so. The Times Leader has a right to inspect and copy the DER documents and records it has requested from these defendants in their official capacity since these DER documents and records are the official records of the DER, the public agency for which the defendants work and are themselves public records.
 
 
 193
 9. These defendants have refused the plaintiffs and the public access to these documents and records without authority from the DER or the Executive Branch of the Commonwealth's government to make such a refusal.
 
 
 194
 10. The constitutional and statutory rights of the plaintiffs to inspect and copy the records of the DER are being denied by the defendants.
 
 
 195
 11. The refusal of the defendants to turn over the public documents and records in the possession of the Department of Environmental Resources is a violation of the public's right to know about the effectiveness with which the defendants and the DER are protecting the environment in Northeast Pennsylvania.
 
 
 196
 12. The Department of Environmental Resources has engaged in a pattern or practice of denying the public access to records of the Department of Environmental Resources to which the public is entitled.
 
 
 197
 13. The standards utilized by the Department of Environmental Resources to grant or deny access to the public to records of DER are arbitrary and capricious.
 
 
 198
 WHEREFORE, plaintiffs respectfully request this honorable Court:
 
 
 199
 A. To immediately order the defendants to make all DER records available to plaintiffs for inspection and copying; and
 
 
 200
 B. To require the Department of Environmental Resources to adopt a uniform policy to provide the public access to DER records in a manner consistent with Constitutional and statutory guarantees; and
 
 
 201
 C. To submit the proposed policy to the court for approval; and
 
 
 202
 D. To reimburse plaintiffs for counsel fees and costs in bringing and prosecuting this claim; and
 
 
 203
 E. Provide such other relief as this Court deems just and equitable under the circumstances.
 
 
 204
 /s/ Ralph E. Kates, III
 
 Ralph E. Kates, III, Esquire
 Attorney for Plaintiffs
 408 Wilkes-Barre Center
 39 Public Square
 Wilkes-Barre, Pennsylvania 18701
 
 205
 (717) 825-2495
 
 
 
 [1]
 This definition of non-public records is consistent with Pa.Stat.Ann. tit. 65 (Purdon 1959 & Supp.1985), which provides for access to "every public record of an agency," Sec. 66.2, and further provides that:
 the term "public records" shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties, ... it shall not include any record, document, material, exhibit, pleading, report, memorandum or other paper, access to or the publication of which is prohibited, restricted or forbidden by statute law or order or decree of court, or which would operate to the prejudice or impairment of a person's reputation or personal security, or which would result in the loss by the Commonwealth or any of its political subdivisions ... of Federal funds, excepting therefrom however the record of any conviction for a criminal act.
 Pa.Stat.Ann. tit. 65, Sec. 66.1(2).
 
 
 [2]
 See, e.g., Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Near v. Minnesota ex rel Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)
 
 
 [3]
 See, e.g., Pell v. Procunier, 417 U.S. 817, 832, 94 S.Ct. 2800, 2809, 41 L.Ed.2d 495 (1974); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965)
 
 
 [4]
 See, e.g., Press-Enterprise Co. v. Superior Court, --- U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (Press-Enterprise II ); Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Press-Enterprise I ); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 564, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980)
 
 
 [5]
 Article I, Section 5, of the Constitution of the United States provides in full:
 "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal."
 
 
 [6]
 5 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA IN 1787, at 408 (J. Elliot ed. 1881) [hereinafter cited as ELLIOT'S DEBATES] (statement of James Wilson)
 
 
 [7]
 See O'Brien, The First Amendment and the Public's "Right to Know," 7 Hastings Const.L.Q. 579, 593 (1980)
 
 
 [8]
 3 ELLIOT'S DEBATES, supra note 6, at 169-70
 
 
 [9]
 Id. at 170
 
 
 [10]
 Id. at 409
 
 
 [11]
 Watkins, Open Meetings under the Arkansas Freedom of Information Act, 38 Ark.L.Rev. 268, 271 & n. 96. Although reporters attended initial sessions of the House in 1789, by 1792 sessions were regularly closed. Id
 
 
 [12]
 Id. at 272
 
 
 [13]
 S.Rep. 474, 96th Cong. 2nd Sess., 126 Cong.Rec. S15209-10 (daily ed., Dec. 1, 1980)
 
 
 [14]
 Id., at S15210
 
 
 [15]
 Id
 
 
 [16]
 Jefferson emphasized the value of public access to governmental information even when confronted with Shay's Rebellion: "The way to prevent these irregular interpositions of the people, is to give them full information of their affairs thro' the channel of the public papers, and to contrive that those papers should penetrate the whole mass of the people." Letter from Jefferson to Edward Carrington (Jan. 16, 1787), reprinted in 11 THE PAPERS OF THOMAS JEFFERSON 49 (J. Boyd ed. 1955), quoted in O'Brien, supra, 7 Hastings Const.L.Q. at 592
 
 
 [17]
 RANDALL, 3 LIFE OF THOMAS JEFFERSON 211 (1858), reprinted in WIGGINS, FREEDOM OR SECRECY 67-68 (1964)
 
 
 [18]
 5 U.S.C. Sec. 552 (1984) (as amended). The Freedom of Information Act of 1967 itself amended the public access provisions of the Administrative Procedure Act, 5 U.S.C. Secs. 1001-11 (1964). See Note, The Freedom of Information Act: A Critical View, 38 Geo.Wash.L.Rev. 150 (1969). When President Johnson signed the Freedom of Information Act on July 4, 1966, he stated,
 [T]his bill in no way impairs the President's power under our Constitution to provide for confidentiality when the national interest so requires. There are some who have expressed concern that the language of this bill will be construed in such a way as to impair government operations. I do not share this concern.
 Statement on Signing Pub.L. 89-497, July 4, 1966, reprinted in Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act (1967), quoted in O'REILLY, FEDERAL INFORMATION DISCLOSURE 2-12.
 
 
 [19]
 5 U.S.C. Sec. 552(a) (1984) (as amended)
 
 
 [20]
 5 U.S.C. Sec. 552(b) (1976)
 
 
 [21]
 O'REILLY, supra note 18, at 2-13
 
 
 [22]
 Watkins, supra note 11, at 268
 
 
 [23]
 Congress has also mandated the withholding of government-held information in a variety of situations, e.g., 18 U.S.C. Secs. 793, 794, 641; 13 U.S.C. Secs. 8, 9, 214; 26 U.S.C. Sec. 6103
 
 
 [24]
 In accordance with the law of our circuit, the judiciary would weigh the value of secrecy against the value of public access to government information generally, rather than against the value to the public of the particular information sought. See United States v. Smith, 776 F.2d 1104 (3d Cir.1985). If not, the problem foreseen by the Chief Justice will be exacerbated immeasurably
 
 
 [25]
 See BeVier, An Informed Public, an Informing Press: The Search for a Constitutional Principle, 68 Calif.L.Rev. 482 (1980); Blasi, The Pathological Perspective and the First Amendment, 85 Colum.L.Rev. 449, 492 (1985); Henkin, The Right to Know and the Duty to Withhold: The Case of the Pentagon Papers, 120 U.Pa.L.Rev. 271, 278-79 (1971)
 
 
 [26]
 Henkin, supra note 25, at 279
 
 
 [27]
 The analysis of historic practice in Richmond Newspapers, Globe Newspaper Co. and Press-Enterprise I focused on the "time when our organic laws were adopted." Richmond Newspapers, 448 U.S. at 569, 100 S.Ct. at 2823 (opinion of Burger, C.J.); Globe, 457 U.S. at 605, 102 S.Ct. at 2619; Press-Enterprise I, 464 U.S. at 505, 508-09, 104 S.Ct. at 821, 823-24. Press-Enterprise II canvassed the last two hundred years of our national experience in reaching its conclusion that open preliminary hearings have been "accorded 'the favorable judgment of experience.' " --- U.S. at ----, 106 S.Ct. at 2742. Justices Stevens and Rehnquist, dissenting in Press-Enterprise II, objected to the majority's reliance on historical practice at a time after the First Amendment was adopted. In their view, the value of the historical analysis is in "what is revealed about the intentions of the Framers and ratifiers of the First Amendment." --- U.S. at ----, 106 S.Ct. at 2748 (Stevens, J., dissenting)
 
 
 [1]
 A plausible argument can be made that Pennhurst II should be limited to structural injunctions that interfere on a massive level with the ongoing management of state institutions. Nothing in the majority opinion in Pennhurst II, however, suggests such a limitation, and this court has recognized that the decision applies even to individual claims
 
 
 [2]
 Giardia is from the genus of flagellate protozoa of the order Polymastigida, and from the class of zoomastigophoea. It is found in the intestinal tract of man and of animals, and may cause protracted, intermittent diarrhea with symptoms suggesting malabsorbtion. Dorland's Illustrated Medical Dictionary 643 (25th ed. 1974)
 
 
 [3]
 The majority's precise holding with respect to the legal sufficiency of the complaint is in Part II E of the opinion of the court. The holding is that the complaint was properly dismissed because it failed to allege a tradition of public access. I discuss the majority's treatment of the complaint in Part III E infra
 
 
 [4]
 Thus, this case comes to us in a markedly different posture than First Amendment Coalition v. Judicial Inquiry and Review Board, 784 F.2d 467 (3d Cir.1986), where the state officials, at the district court level and on appeal, advanced arguably significant state interests justifying the denial of access
 
 
 [5]
 See discussion in Part III E, infra
 
 
 [6]
 See, e.g. Board of Educ. v. Pico, 457 U.S. 853, 867 n. 20, 102 S.Ct. 2799, 2808, n. 20, 73 L.Ed.2d 435 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 587, 100 S.Ct. 2814, 2833, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring); Carey v. Brown, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980); Consolidated Edison Co. v. Public Serv. Comm'n., 447 U.S. 530, 534 n. 3, 100 S.Ct. 2326, 2331 n. 3, 65 L.Ed.2d 319 (1980); Herbert v. Lando, 441 U.S. 153, 185 n. 3, 99 S.Ct. 1635, 1653 n. 3, 60 L.Ed.2d 115 (Brennan, J., dissenting in part); Houchins v. KQED, 438 U.S. 1, 31 n. 21, 98 S.Ct. 2588, 2605 n. 21, 57 L.Ed.2d 553 (1978) (Stevens, J., dissenting); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 777 n. 11, 98 S.Ct. 1407, 1416 n. 11, 55 L.Ed.2d 707 (1978); Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 765 n. 19, 96 S.Ct. 1817, 1827 n. 19, 48 L.Ed.2d 346 (1976); Hynes v. Mayor of Oradell, 425 U.S. 610, 627-28 n. 3, 96 S.Ct. 1755, 1763-64 n. 3, 48 L.Ed.2d 243 (1976) (Brennan, J., concurring in part); Gertz v. Robert Welch, Inc., 418 U.S. 323, 382-83 n. 15, 94 S.Ct. 2997, 3027-28 n. 15, 41 L.Ed.2d 789 (1974) (White, J., dissenting); Saxbe v. Washington Post Co., 417 U.S. 817, 836, n. *, 94 S.Ct. 2827, 41 L.Ed.2d 509 (1974) (Douglas, J., dissenting); Police Dep't of Chicago v. Mosely, 408 U.S. 92, 96 n. 4, 92 S.Ct. 2286, 2290 n. 4, 33 L.Ed.2d 212 (1972); New York Times Co. v. Sullivan, 376 U.S. 254, 297 n. 6, 84 S.Ct. 710, 735 n. 6, 11 L.Ed.2d 686 (1964) (Goldberg, J., concurring). See Generally Brennan, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv.L.Rev. 1 (1965)
 
 
 [7]
 See Gibbons, The Interdependence of Legitimacy: An Introduction to the Meaning of Separation of Powers, 5 Seton Hall L.Rev. 435, 463-66 (1974)
 
 
 [8]
 See In re Grand Jury Matter, Gronowicz, 764 F.2d 983 (3d Cir.1985)
 
 
 [9]
 Chief Justice Burger announced the Court's judgment, and delivered an opinion in which Justices White and Rehnquist joined. Justice Stewart filed an opinion concurring in the judgment, and Justice Stevens filed a dissenting opinion in which Justices Brennan and Powell joined. Justices Marshall and Blackmun took no part in the case
 Paradoxically, Justice Stewart, in his concurring opinion in Houchins, in contrast with his opinion of the Court in Pell v. Procunier, 417 U.S. at 832-35, 94 S.Ct. at 2809-10, suggested that the first amendment is not relevant to access to information. 438 U.S. at 16, 98 S.Ct. at 2597. He retreated from that position in Gannett Co. v. DePasquale, 443 U.S. 368, 392-93, 99 S.Ct. 2898, 2911-12, 61 L.Ed.2d 608 (1979).
 
 
 [10]
 Chief Justice Burger and Justice Rehnquist joined the opinion of the Court, and also filed separate concurring opinions. 443 U.S. at 394-97, 99 S.Ct. at 2912-14 (Burger, C.J., concurring); 403-06, 99 S.Ct. at 2917-19 (Rehnquist, J., concurring). Justice Blackmun wrote an opinion concurring in part and dissenting in part, which was joined by Justices Brennan, White, and Marshall. Id. at 406-48, 99 S.Ct. at 2919-40 (Blackmun, J., Brennan, J., White, J., and Marshall, J., concurring in part and dissenting in part)
 
 
 [11]
 Only Justice Rehnquist dissented, but the authority he relied upon is the Gilbert and Sullivan operetta "Iolanthe." Id. 457 U.S. at 604, 102 S.Ct. at 2618
 
 
 [12]
 Judge Adams purports to distinguish this case from First Amendment Coalition v. Judicial Inquiry and Review Board, 784 F.2d 467 (3d Cir.1986), on the ground that here there is no showing of historical practice. That is simply not true. In this case, we have a legislative mandate, in effect since 1957, establishing as a general rule the right of citizen access to agency records. See Pa.Stat.Ann. tit. 65, Sec. 66.2 (Purdon 1959). Thus we have hard evidence that for approximately the past 30 years, state agencies in Pennsylvania have afforded the public the right of access claimed here
 Judge Adams' contention that the asserted right of access or its "functional analogue" must be extant in colonial times in order for there to be a sufficient showing of historical practice is absurd. Many if not most governmental agencies and activities of the Twentieth Century did not exist at that time or for 100 years thereafter. The effect of Judge Adams' rule is that citizens will have a right of access only to the records of or about that miniscule number of government agencies whose activities date back in some form to the colonial period. This rule ignores the fact that this country has experienced an enormous, growth in governmental activity over the past 250 years, and runs counter to the fundamental tenet underlying our constitutional jurisprudence that, "we must never forget that it is a constitution we are expounding." McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819).
 
 
 [13]
 A. Bickel, The Least Dangerous Branch (1962)
 
 
 [14]
 This equal protection claim also has a first amendment component. See Widmar v. Vincent, 454 U.S. 263, 280, 102 S.Ct. 269, 279, 70 L.Ed.2d 440 (1981); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 784-86, 98 S.Ct. 1407, 1420-21, 55 L.Ed.2d 707 (1978); City of Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 175-76, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976); Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972), American Broadcasting Cos. v. Cuomo, 570 F.2d 1080, 1083 (2d Cir.1977); Sherrill v. Knight, 569 F.2d 124, 129 (D.C.Cir.1977)
 
 
 [1]
 It must be remembered that neither the district court nor this court is examining Times Leader's initial complaint. Times Leader has already amended that complaint. In neither its original nor amended version can any hint of an equal protection claim be found
 
 
 [2]
 In a footnote, the district court stated that Times Leader "relies upon the Affidavit of Robert Scheider [sic], Assistant City Editor for the Wilkes-Barre Times Leader as establishing plaintiff's Equal Protection claim." District Court op. at App. 85a, n. 10. The court also made reference to plaintiffs' "brief," obviously referring to Times Leader's memorandum of law in opposition to defendants' motion to dismiss. Docket entry 20, App. 3a. However, that brief is not part of the record on this appeal and the majority opinion properly does not rely upon Scheier's affidavit
 
 
 [3]
 Curiously, the majority, without permitting amendment of the complaint, sustains the dismissal of Times Leader's first amendment access claim because the complaint did not allege a tradition of public access. Maj. op. at 1175. I agree with the substantive disposition, but not because of Times Leader's purported pleading deficiency. Under our notice pleading precedents, it is obvious that the complaint asserts a public access claim--a claim which on the merits must be dismissed. Yet, inexplicably, where it is obvious that no equal protection claim has been pleaded, the majority remands to develop an appropriate record. I leave it to more experienced jurists than I to attempt to explain these two irreconcilable actions